# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BRYAN SHIRLEY, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-11-581 |
| | § | |
| PRECISION CASTPARTS CORP., | § | |
| WYMAN-GORDON FORGINGS, L.P., | § | |
| WYMAN-GORDON COMPANY, and | § | |
| WYMAN-GORDON FORGINGS, INC., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM, ORDER AND FINAL JUDGMENT

Pending before the court is defendants Precision Castparts Corp., Wyman-Gordon Forgings, L.P., and Wyman-Gordon Forgings, Inc.'s (collectively, "Defendants" or "Wyman-Gordon") motion for summary judgment.[1]  Dkt. 18.  Upon consideration of the motion, responses, and applicable law, Defendants' motion for summary judgment is GRANTED.

## I. BACKGROUND

This is a disability discrimination case.  Plaintiff Bryan Shirley ("Shirley") began working for Wyman-Gordon Forgings, L.P. ("Wyman-Gordon") in August 1997, as an extrusion press operator.  Dkt. 18.  During his twelve years of employment with Wyman-Gordon, Shirley sustained some work-related injuries which caused him pain.  *Id.*  As a result, Shirley was prescribed Vicodin by his doctor for pain management.  *Id.*  He ultimately received multiple prescriptions of Vicodin from different doctors, without informing each doctor about his other prescriptions because he "didn't want them to know."  Dkt. 18, App. 2, Ex. A at 37.

---

[1] Wyman-Gordon Company was never served in this matter.

In late November 2009, Shirley became concerned about the frequency and dosage of his Vicodin usage and voluntarily requested time off from work in order to obtain medical treatment. *Id.* at 40, 42. He received approval for "short-term disability leave" from Wyman-Gordon's Human Resources representative, Alan Barnett ("Barnett"), which also qualified him for, and ran concurrently with, Family and Medical Leave Act ("FMLA") leave pursuant to company policy. Dkt. 18, App. 1, Ex. A at 127. After conferring with Barnett about facilities, Shirley checked into the Memorial Hermann Prevention and Recovery Center on December 3, 2009, to begin treatment. Dkt. 18, App. 1, Ex. B at 3. Two days later, Shirley was discharged early, albeit in stable condition, at his own request. *Id.* at 5. Shirley told Barnett that the reason he left Memorial Hermann was because his treating physician, Dr. Leath, wanted to find an alternative, non-addictive drug for Shirley's pain-management, but Shirley wanted to remain on an opiate drug, as Shirley claimed that opiates were the only type of drug that worked for his pain. Dkt. 20, Ex. 2 at 110. After leaving treatment, Shirley went to his primary care physician, Dr. David W. Hoefer, who Shirley claims stated that it was "fine" if Shirley continued to take Vicodin for his pain, though Dr. Hoefer was trying to find something non-addictive that would work. Dkt. 20, Ex. 1 at 51, 69. Shirley obtained a release to return to work from Dr. Hoefer on December 9, 2009. Dkt. 18, App. 2, Ex. A, Ex. 2.

When Shirley returned to work, Barnett verbally informed Shirley that leaving the treatment facility prior to treatment completion amounted to grounds for termination under Wyman-Gordon's Drug-Free Workplace Policy. Dkt. 18, App. 1, Ex. A at 112-13. Shirley indicated he was unaware of the consequences of leaving treatment. *Id.* at 113. Wyman-Gordon, rather than immediately terminating Shirley's employment pursuant to its policy, allowed Shirley to reenter Memorial Hermann on December 11, 2009. *Id.* Shirley tested positive for hydrocodone when he was readmitted. Dkt. 18, App. 1, Ex. B at 7. He consented to residential treatment, but he checked out

2

of the program the next day.  *Id.* at 11.  Shirley's treating physician at Memorial Hermann wrote a note on December 12, 2009, stating "Has completed detox. Has <u>not</u> completed treatment."  Dkt. 18, App. 2, Ex. A, Ex. 1.  Shirley admits he continued using Vicodin for at least one year after December 12, 2009.  Dkt. 18, App.2 at 63.

Shirley was terminated from Wyman-Gordon effective December 14, 2009, for his failure to complete the Memorial Hermann drug treatment program.  Dkt. 18, App. 1, Ex. A, Ex. 5.  Shirley filed his original complaint on February 16, 2011, alleging disability discrimination and termination in violation of the FMLA.  Dkt. 1.  After submitting their respective answers, Defendants moved for summary judgment in their favor on May 5, 2012.  Dkt. 18.

## II. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986).  Only when the moving party has discharged this initial burden

3

does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to summary judgment, and no defense to the motion is required. *Id.* "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting former Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000). However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). By the same token, the moving party will not meet its burden of proof based on conclusory

4

"bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978);

*see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

**A.  ADA**

Under the Americans with Disabilities Act ("ADA"), an employer may not discriminate

against an employee on the basis of his or her disability.  42 U.S.C. § 12112 (2009).  Under the

ADA, a "disability" is "a physical or mental impairment that substantially limits one or more major

life activities."  *Id.* § 12102(1)(A).  There must be a "record of such an impairment," or the

individual must be "regarded as having such an impairment." *Id.* § 12102(1)(B)-(C). "An individual

meets the requirement of 'being regarded as having such an impairment' if the individual establishes

that he or she has been subjected to an action prohibited under this chapter because of an actual or

perceived physical or mental impairment whether or not the impairment limits or is perceived to

limit a major life activity."  *Id.* § 12102(3)(A).  "Major life activities" include "caring for oneself,

performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending,

speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

*Id.* § 12101(2)(A).

The ADA's definition of an employee with a "disability" does not include an individual "who

is currently engaging in the illegal use of drugs."  *Id.* § 12114(a)**.**  "Illegal use of drugs" is defined

as "the use of drugs, the possession or distribution of which is unlawful under the Controlled

Substances Act" and "includes the illegal misuse of pain-killing drugs which are controlled by

prescription."  *Id.* § 12111(6)(A); *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 611 n.12 (10th Cir.

1998).  It is unlawful under the Controlled Substances Act to "knowingly or intentionally . . . acquire

or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or

subterfuge." 21 U.S.C. § 843(a)(3) (2009).  However, the ADA contains a safe harbor provision

which provides the following:

> **(b) Rules of construction**
>
> Nothing in subsection (a) of this section shall be construed to exclude as a qualified individual with a disability an individual who--
>
> > **(1)** has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use;
> >
> > **(2)** is participating in a supervised rehabilitation program and is no longer engaging in such use;
> >
> > **(3)** is erroneously regarded as engaging in such use, but is not engaging in such use; except that it shall not be a violation of this chapter for a covered entity to adopt or administer reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual described in paragraph (1) or (2) is no longer engaging in the illegal use of drugs.

42 U.S.C. § 12114(b)(1)-(2).

In this case, Shirley was consuming Vicodin, a legally prescribed pain-killing drug.  Although

he was initially prescribed the drug lawfully, his use became illegal when he obtained additional

prescriptions from other physicians without full disclosure to each.  Shirley admits that he did not

tell each physician about his other prescriptions because he "didn't want them to know."  Dkt. 18,

App. 2, Ex. A at 37.  Shirley's intentional concealment of his other prescriptions, a material fact,

when dealing with each physician clearly amounts to "misrepresentation, fraud, forgery, deception,

or subterfuge."

Although illegal use of a prescription drug does not qualify as a "disability" under the ADA,

Shirley argues that he is entitled to protection under the ADA because he was not "currently

engaging in the illegal use of drugs" when his employment was terminated.  Dkt. 20 at 6.  Rather, he had one lawfully provided prescription.  "Under the ADA, 'currently' means that the drug use was sufficiently recent to justify the employer's reasonable belief that the drug abuse remained an ongoing problem." *Zenor v. El Paso Heathcare Sys., Ltd.*, 176 F.3d 847, 856 (5th Cir. 1999) (citing 143 CONG. REC. H103-01 (1997)).  The *Zenor* court held  that "the characterization of 'currently engaging in the illegal use of drugs' is properly applied to persons who have used illegal drugs in the weeks and months preceding a negative employment action." *Id.*  While Shirley had perhaps discontinued his "illegal" use of drugs at the time of his termination because he was no longer taking multiple prescriptions, he had engaged in illegal use within the weeks and months preceding his termination, and it was reasonable for his employer to believe – particularly since he withdrew from two treatment programs – that the illegal use was ongoing.

Shirley contends, however, that he is protected by the safe harbor provision for two reasons. Dkt. 20.  First, he reasserts that even though he withdrew from the treatment programs, he was no longer engaging in the illegal use of drugs at the time of his termination.  *Id.*  With regard to the timing of the illegal drug use, the legislative history behind the safe harbor provision indicates that "refraining from illegal use of drugs . . . is essential.  Employers are entitled to seek reasonable assurances that no illegal use of drugs is occurring or has occurred recently enough so that continuing use is a real and ongoing problem."  H.R. Conf. Rep. No. 101-596, at 64 (1990), *reprinted in* 1990 U.S.C.C.A.N. 565, 573.  Courts have found that plaintiffs who invoke the safe harbor provision, but have failed to refrain from the illegal use of drugs for a sufficient period of time, are not entitled to safe harbor protection.

For example, in *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182 (9th Cir. 2001), the Ninth Circuit refused to apply the safe harbor provision to a plaintiff who was participating in a rehabilitation

7

program at the time of her termination.  The plaintiff was terminated for excessive unexcused absences from work six days after being incarcerated for drunk driving and possession of methamphetamine.  *Brown*, 246 F.3d at 1188.  The court determined that "continuing use of drugs and alcohol was clearly an ongoing problem at least until" the date of the incarceration and that she had "not refrained from the use of drugs and alcohol for a sufficient length of time" to be entitled to "the protections of the ADA's safe-harbor provision."  *Id.*

Similarly, in *Mauerhan v. Wagner Corp.*, 649 F.3d 1180 (10th Cir. 2011), the Tenth Circuit held that "although participating in or completing a drug treatment program will bring an individual closer to qualifying for the safe harbor, an individual must also be 'no longer engaging in' drug use for a sufficient period of time that the drug use is no longer an ongoing problem."  *Mauerhan*, 649 F.3d at 1187.  In *Mauerhan*, the plaintiff had completed an inpatient rehabilitation program and was no longer using drugs.  *Id.* at 1183.  The Tenth Circuit reasoned that:

> No formula can determine if an individual qualifies for the safe harbor for former drug users or is "currently" using drugs, although certainly the longer an individual refrains from drug use, the more likely he or she will qualify for ADA protection. Instead, an individual's eligibility for the safe harbor must be determined on a case-by-case basis, examining *whether the circumstances of the plaintiff's drug use and recovery justify a reasonable belief that drug use is no longer a problem*.

*Id.* at 1188 (emphasis added).  The court noted that the defendant had presented summary judgment evidence that the plaintiff's prognosis was "guarded" and that it would take approximately three months worth of treatment for any significant improvement in the plaintiff's addiction.  *Id.* at 1189. The court determined that the plaintiff "failed to rebut evidence that more time was required for him to reach a stable state in his recovery," and that he failed to raise a serious issue of material fact.  *Id.*

Here, the evidence overwhelmingly supports the conclusion that Shirley was illegally using prescription drugs when he initially checked himself into Memorial Hermann on December 3, 2009. *See, e.g.*, Dkt. 18, App. 1, Ex. B at 3 (advising Memorial Hermann that he had been taking eighteen to twenty doses of Vicodin per day for approximately three years). Shirley was terminated from Wyman-Gordon eleven days later. Dkt. 18, App. 1, Ex. A, Ex. 5. Whether or not Shirley was *illegally* using drugs on the day he was terminated, he admits he continued to take Vicodin "as needed" for at least a year after his termination. Dkt. 18, App. 2, Ex. A at 63. The court finds that illegal use of drugs eleven days before termination was not a sufficient amount of time for Shirley to be entitled to safe harbor protection in this case, particularly since he continued to use the same type of drug. Based on Shirley's insistence that he remain on the same type of drug to which he was addicted, his repeated failure to complete treatment, and his continued use of Vicodin following his termination, the evidence supports a reasonable belief that continued drug use was still an ongoing problem at the time Wyman-Gordon terminated his employment.

Shirley next argues that he is entitled to protection under the safe harbor provision because he was participating in a rehabilitation program under the supervision of his primary care physician at the time his employment was terminated. Dkt. 20 at 7. Shirley's primary care physician indeed stated that Shirley was "ready for out-patient therapy" on December 9, 2009. Dkt. 20, Ex. 4. However, "mere participation in a rehabilitation program is not enough to trigger the protections of § 12114(b)." *Brown*, 246 F.3d at 1188. Because the court finds that Wyman-Gordon had a reasonable suspicion that illegal drug use was an ongoing problem at the time Shirley's employment was terminated, it need not determine the qualifications of Dr. Hoefer's rehabilitation program. Accordingly, Defendants' motion for summary judgment on Shirley's ADA claim is GRANTED.

B.    **FMLA**

Shirley alleges that Wyman-Gordon violated the FMLA by failing to reinstate his previous position after he was cleared to return to work by his treating physician.  Dkt. 1.  Defendants seek summary judgment on this claim, arguing that Shirley never requested to be placed on FMLA leave, that there is no evidence that Wyman-Gordon designated Shirley's leave as FMLA leave, and that even if the leave were designated as FMLA leave, Shirley was not protected because he did not comply with the Wyman-Gordon Drug-Free Workplace Policy (the "Policy").  Dkt. 18.  Shirley contends that he clearly put Wyman-Gordon on notice that he needed FMLA leave by seeking leave for inpatient treatment and that he was not required to specifically state that he needed FMLA leave. Dkt. 20.  Shirley also argues that Wyman-Gordon's excuse for terminating his employment—that he violated the Policy—is pretext because Shirley never "rejected" treatment.  *Id.*

The FMLA provides that "any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced."  29 U.S.C. § 2614(1)(A) (2008).  An employee is an "eligible employee" under the FMLA if he or she has been employed by the employer for at least twelve months and have worked at least 1,250 hours of service during the previous twelve-month period.  *Id.* § 2611(2)(A).  Eligible employees "shall be entitled to a total of 12 workweeks of leave . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of the employee." *Id.* § 2612(a)(1)(D).  "Serious health condition means an illness, injury, impairment, or physical or mental condition that involves . . . (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."  *Id.* § 2611(11)(A)-(B).  In order to preserve the availability of these rights, section 2615(a)(1) makes it "unlawful for an employer

10

to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." *Id.* § 2615(a)(1).

Here, it is undisputed that Shirley was an "eligible employee" as that term is defined in the FMLA because he had worked for Wyman-Gordon for more than a year and had worked at least 1,250 hours during the preceding year. *See* Dkts. 1, 8.  Additionally, because Shirley was admitted to Memorial Hermann for inpatient care attributed to his physical and mental condition of addiction to prescription pain-killers, his condition qualifies as a "serious health condition" under section 2611(11)(A) of the FMLA.  Wyman-Gordon argues that Shirley was not on FMLA leave when he attended the drug treatment programs because he did not specifically invoke the FMLA when requesting leave. Dkt. 18.  However, the Fifth Circuit has held that an employee is not required to invoke the FMLA statute's protection expressly when he notifies his employer of his need for leave for a serious health condition.  *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758 (5th Cir. 1995).[2] Shirley contends that in 2009, his consumption of Vicodin became such a problem that he voluntarily requested time off from work to seek help. Dkt. 18, App. 2, Ex. A at 40.  Shirley further asserts that he was approved for short-term disability leave by Barnett, which put Wyman-Gordon on notice of Shirley's need for FMLA leave.  *Id.*; Dkt. 18, App. 1, Ex. A at 127.   Indeed, it appears, notwithstanding its position that Shirley must specifically request FMLA leave, that Wyman-Gordon considered Shirley's leave to be FMLA leave.  Barnett noted during his deposition that short-term

---

[2] In *Manuel*, the plaintiff requested time off from work to obtain medical treatment for an ingrown toe nail.  *Id.*  Her employer argued that because she did not use the words "FMLA," she was not placed on FMLA leave and was not subject to its protections.  *Id.*  The court in *Manuel* pointed out that Congress "did not intend employees . . . to become conversant with the legal intricacies of the Act," and therefore, the FMLA "does not require an employee to invoke the language of the statute to gain its protection when notifying her employer of her need for leave for a serious health condition."  *Id.* at 764.

11

disability leave and FMLA leave run concurrently, and stated that because "very few, if any, employees ever request[] FMLA" leave, if an employee is on short-term disability leave, he is automatically on FMLA leave as well.  Dkt. 20, Ex. 2 at 127:8-14.  Thus, the court finds Wyman-Gordon's position that Shirley needed to specifically request FMLA leave unavailing.

Defendants next argue that because Shirley did not comply with its Drug-Free Workplace Policy (the "Policy") by completing treatment, he was not eligible for FMLA benefits.  Dkt. 18.  Section 2614(a)(4) of the FMLA permits employers to impose, as a condition of restoration of employment and benefits, "a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work."  *Id.* § 2614(a)(4).  The Department of Labor further explains that:

> . . . if the employer has an established policy, applied in a non-discriminatory manner that has been communicated to all employees, that provides under certain circumstances an employee may be terminated for substance abuse, pursuant to that policy the employee may be terminated whether or not the employee is presently taking FMLA leave.

§ 825.119(b).  Wyman-Gordon's Policy clearly states that "[a]ny employee suffering from an alcohol or drug program who rejects treatment or who leaves a treatment program prior to being properly discharged will be terminated."  Dkt. 18, App. 1, Ex. 1 at 38.

While the Fifth Circuit has not ruled on this issue, the Third Circuit has held that an employer's alcohol and drug policy requiring completion of a treatment program was not unlawfully discriminatory.  *Cole v. Exxon Mobile Corp.*, 142 F. App'x 52 (3rd Cir. 2005).  In *Cole*, the plaintiff attended a number of rehabilitation treatment sessions for alcohol abuse, but failed to comply with the company's requirement for completion of those programs.  *Id.* at 53.  The employer gave the plaintiff multiple warnings that failure to complete treatment would result in her termination before

finally discharging her. *Id.* Similarly, the Seventh Circuit held in *Harrell v. U.S. Postal Service* that an employer did not violate the FMLA when it terminated an employee for failing to comply with more stringent return-to-work requirements than what the FMLA set forth. *Harrell v. U.S. Postal Serv.*, 445 F.3d 913 (7th Cir. 2006) (requiring a very detailed return-to-work certification and a medical examination by an employer-selected physician). The holdings in *Cole* and *Harrell* support Wyman-Gordon's position that it lawfully required adherence to its Policy. Similar to the employer in *Cole*, Wyman-Gordon verbally informed Shirley that Dr. Hoefer's note would not suffice and gave Shirley a second opportunity to complete his treatment before finally terminating him on December 14, 2009.

The restoration of Shirley's employment was contingent on Shirley's successful completion of rehabilitation treatment pursuant to his employer's Policy. Shirley argues that he did not *reject* treatment because he completed detoxification at Memorial Hermann and then scheduled outpatient treatment with his treating physician, Dr. Hoefer. Dk. 20. The Policy, however, clearly states that an employee "who rejects treatment <u>or</u> who leaves <u>a</u> treatment program prior to being properly discharged <u>will</u> be terminated." Dkt. 18, App. 1, Ex. 1 at 38 (emphasis added). The evidence clearly shows that as of his discharge from Memorial Hermann, Shirley had "<u>not</u> completed treatment." Dkt. 18, App. 2, Ex. A, Ex. 1. Thus, he left "<u>a</u> treatment program prior to being properly discharged." Shirley has not presented the court with any evidence that this policy was applied in a discriminatory manner or not properly communicated to employees. Thus, under the Department of Labor guidelines, terminating Shirley pursuant to the clear terms of the Policy was not a violation of the FMLA.

Shirley next argues that Wyman-Gordon's reliance on the Policy is clearly false because "the only provision in Wyman-Gordon's policy that allows the company to select the treatment program

is contained within section VI(B)," which applies only to employees who have been convicted of a criminal drug offense and thus does not apply to Shirley.  Dkt. 20.  Shirley contends that he was entitled to choose his own program, and that he elected to detoxification at Memorial Hermann and to obtain outpatient treatment from Dr. Hoefer.  *Id.*  His outpatient treatment with Dr. Hoefer was ongoing at the time of his termination.  *Id.*  Shirley, however, clearly failed to complete the Memorial Hermann *treatment* program.  When asked if he completed the treatment program during his deposition, Shirley stated,

> As far as treatment goes, I went in there for detox and that's what I completed.  As far as the treatment, I mean, I'm not going to sit there and say, "Okay, I'm an alcoholic.  I need some spiritual education. I need to go to the woman's grief group.  I'm going to Cocaine Anonymous."  I'm going to – narcotics anonymous is the one I said I would go to and it was a one two-hour block once a week.  I said I'd go to that continuously; but that wasn't good enough for them . . . .

Dkt. 20, Ex. 1 at 60:18-61:2.  Shirley insists that he completed the Memorial Hermann detoxification program, elected to have Dr. Hoefer supervise his treatment, and only reentered the Memorial Hermann program to get verification that he had completed detoxification.  *See generally id.*  In the discharge papers after his first admission to Memorial Hermann, his physician at Memorial Hermann noted that Shirley requested to leave after detoxification because he felt "like a caged animal" and "too hemmed in."  Dkt. 20, Ex. 2 at 5.  The physician stated that Shirley did "need treatment on some level" and that is "was a mistake that [Shirley was] leaving."  *Id.*  Shirley then went to Dr. Hoefer and obtained a release to return to work.  Dkt. 20, Ex. 4.  Barnett informed Shirley that his treatment provider of record was Memorial Hermann and that he would have to complete treatment there before returning to work.  Dkt. 20, Ex. 2 at 87.  Shirley thus went back to Memorial Hermann.  His "consent for treatment" for his second admission states that Shirley was being admitted for the residential program, not detoxification.  *See* Dkt. 20, Ex. B at 11.  However, by the time he spoke

with his treating physician at Memorial Hermann during his second admission, according to his treating physician, Shirley indicated that he did not want to be in treatment and was "purely [there] because his job sent him [there]." Dkt. 18, App. 2, Ex. B at 10. The physician at Memorial Hermann recommended admission for inpatient treatment. *Id.*

The Policy refers to a *treatment* program, not a detoxification program. While the court understands that Shirley decided he would prefer to get treatment under the supervision of Dr. Hoefer rather than through the program at Memorial Hermann after he entered the program, the Policy simply does not support an employee splitting up treatment in this manner. Shirley initially checked himself into the Memorial Hermann program, and he needed to complete that program—detoxification *and* treatment—in order to be in compliance with the Policy. Shirley elected not to do so. At that point, he rejected treatment and left the program without completing it. His ongoing treatment under Dr. Hoefer's care is irrelevant, as the Policy does not contemplate employees changing programs midstream. The court thus finds that Shirley's termination for failure to adhere to the Policy was not a violation of the FMLA. Accordingly, Defendants' motion for summary judgment on Shirley's FMLA claim is GRANTED.

## IV. CONCLUSION

After consideration of the motions, responses, and applicable law, Defendants' motion for summary judgment (Dkt. 18) is GRANTED.

This is a FINAL JUDGMENT.

Signed at Houston, Texas on July 3, 2012.

Gray H. Miller
United States District Judge

15